1 GREGG SHAPIRO, Cal. Bar No. 161436
gshapiro@newmanshapiro.com
2 NEWMAN & SHAPIRO
75 State Street, Suite 100
3 Boston, MA 02109
Telephone: 781-808-6789
4
Attorney for Relator
5 CHI KWAN CHAN

FEE PAID

```
FILED
CLERK, U.S. DISTRICT COURT

6/11/21

CENTRAL DISTRICT OF CALIFORNIA
BY: CS          DEPUTY
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES *ex rel*. CHI KWAN CHAN,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>RGE MOTOR DIRECT INC. d/b/a ONEBIGOUTLET and PHOENIX TOOLS, INC.,<br><br>　　　　　Defendants. | Case No. CV21-4763-RGK(KSx)<br><br>**FALSE CLAIMS ACT COMPLAINT**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)** |

### Introduction

1. Chi Kwan Chan (the "Relator") brings this action as a qui tam relator on behalf of the United States against RGE Motor Direct Inc. d/b/a OneBigOutlet ("OBO") and Phoenix Tools, Inc. ("Phoenix"), pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3729-33, to recover damages, penalties, attorneys' fees and costs, and other relief. Relator alleges that OBO and Phoenix, two California-based importers, conspired with their Hong Kong affiliate, Royal Sourcing Limited a/k/a Jin Zhen Fu Management Consultant Limited ("Royal Sourcing"), to evade tariffs on Chinese merchandise that the United States began to impose in 2018.

2. To offset the increased tariff obligations that OBO and Phoenix began to face in 2018 on Chinese merchandise they imported through Royal Sourcing, OBO, Phoenix, and Royal Sourcing came up with a simple scheme: they shifted much of the real price of the imported merchandise to bogus invoices for "testing" or "certification" of the merchandise. Thus, when Royal Sourcing purchased merchandise from a Chinese vendor for shipment to OBO or Phoenix and the merchandise was subject to a new tariff, Royal Sourcing often either created, or arranged to create with the vendor, three different invoices: (1) a "pro forma" invoice that showed the real price Royal Sourcing and OBO or Phoenix paid for the merchandise; (2) a fake "commercial invoice" with a reduced merchandise price that, in most cases, more than offset the additional duty; and (3) a fake invoice reflecting the supposed testing or certification fee, in an amount that consistently matched the difference between the real pro forma invoice price and the fake commercial invoice price. Then, OBO or Phoenix would pay duty based only on the fake commercial invoice price. As time went on and OBO, Phoenix, and Royal Sourcing realized how much money they could save on duty by creating fake commercial invoices, the companies shifted ever larger portions of the real prices to the bogus testing or certification prices, so that the reduction in the importers' duty obligations far exceeded the costs OBO and Phoenix incurred from the new tariffs that the United States imposed.

3. On information and belief, between mid-2018 and the end of 2020, OBO and Phoenix Tools used this fraudulent scheme to avoid paying over $7 million in duties on Chinese merchandise they imported through Royal Sourcing. The scheme was ongoing in January 2021 when Royal Sourcing terminated Relator's employment.

4. Prior to the filing of this Complaint, Relator made substantive disclosures to the government of facts and evidence underlying the allegations in

this Complaint, in accordance with the requirements of the False Claims Act, 31 U.S.C. § 3730(b)(2).

5. Relator is an original source of the information underlying this Complaint and of the information provided to the United States prior to the filing of this Complaint. *See* 31 U.S.C. § 3730(e)(4)(B). To the Relator's knowledge, the information underlying the allegations and transactions in this Complaint has not been publicly disclosed.

6. This action is filed under seal pursuant to the requirements of the False Claims Act. 31 U.S.C. § 3730(b)(2).

## Jurisdiction and Venue

7. This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-33. This Court has jurisdiction over this action under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1331 and 1345.

8. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

9. This Court may exercise personal jurisdiction over OBO and Phoenix pursuant to 31 U.S.C. § 3732(a) and because they transact business in this District.

## The Parties

10. Relator Chan is a resident of Hong Kong. From March 2018 to January 2021, he was the Sourcing Manager for Royal Sourcing. Although he was employed by Royal Sourcing, he used an OBO e-mail address, chris.c@obo-usa.com. Relator's responsibilities at Royal Sourcing included sourcing product in China, monitoring production status, quality assurance, and order processing.

11. Defendant RGE Motor Direct Inc. d/b/a OneBigOutlet is a California corporation with a principal place of business at 19301 E. Walnut Dr. N., City of Industry, California 91748. OBO also has a warehouse at 631 Omni Industrial Boulevard, Summerville, South Carolina 29486, and it formerly operated a

warehouse at 1570 Perry Road, Plainfield, Indiana 46168. Since at least 2017, OBO has operated as a consignee for imports from China that Royal Sourcing arranged.

12. Defendant Phoenix Tools, Inc., is a California corporation with a registered place of business at 19223 Colima Road, #8, Rowland Heights, California 91748. On information and belief, Phoenix Tools actually operates out of OBO's warehouse location in the City of Industry. Since at least 2019, Phoenix has operated as a consignee for imports from China that Royal Sourcing arranged.

## Regulatory Background

**A. Section 301 Duties on Products from China**

13. Beginning in 2018, pursuant to Section 301 of the Trade Act of 1974, 19 U.S.C. § 2411, the Office of the United States Trade Representative ("USTR") imposed additional duties on four "lists" of products from China. Each list identifies products by their eight-digit Harmonized Tariff Schedule ("HTS") code in the Harmonized Tariff Schedule of the United States.

14. List 1. On June 20, 2018, USTR announced that, effective July 6, 2018, an additional 25 percent duty would apply to products from China on so-called "List 1." See USTR, *Notice of Action and Request for Public Comments Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710, 28,711 (June 20, 2018).

15. List 2. On August 16, 2018, USTR announced that, effective August 23, 2018, an additional 25 percent duty would apply to products from China on so-called "List 2." See USTR, *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823, 40,824 (Aug. 16, 2018).

16. List 3. On September 21, 2018, USTR announced a two-phase implementation of duties on products from China on so-called "List 3." See USTR, *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices*

-4-

*Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47974 (Sept. 21, 2018). Under the initial phase, beginning on September 24, 2018, the duty on List 3 products was 10 percent. *See id.* at 47975. Under the second phase, beginning on May 10, 2019, the duty on List 3 products increased to 25 percent. *See* USTR, *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 20459 (May 9, 2019). In a notice on May 31, 2019, USTR clarified that "[c]overed products that were exported from China to the United States prior to May 10, 2019 will remain subject to an additional 10 percent tariff if they enter into the U.S. before June 15, 2019." USTR, *Notice Regarding Application of Section 301 Action* (May 31, 2019).

    17.    List 4A. On August 30, 2019, USTR announced that, effective September 1, 2019, an additional 15 percent duty would apply to products on Annex A of List 4. *See* USTR, *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 45821 (Aug. 30, 2019). On January 22, 2020, USTR announced that, effective February 14, 2020, the duty on List 4A products would decrease to 7.5 percent. *See* USTR, *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 3741 (Jan. 22, 2020).

**B.    Calculation of Dutiable Amount**

    18.    Section 402 of the Tariff Act of 1930, 19 U.S.C. § 1401a, directs that the dutiable amount of merchandise imported into the United States shall be calculated, where possible, on the "price actually paid or payable for the merchandise when sold for exportation to the United States, plus . . . the value . . . of any assist." 19 U.S.C. § 1401a(b)(1)(C). The statute further explains that the term "assist" includes "[e]ngineering, development, artwork, design work, and plans and

sketches that are undertaken elsewhere than in the United States and are necessary for the production of the imported merchandise." 19 U.S.C. § 1401a(h)(1)(A)(iv).

C. **Documentation Requirements for Importation of Goods into the United States**

19. CBP regulations provide that "the entry documentation required to secure the release of merchandise" arriving at a United States port must include, among other things, "[a] commercial invoice" and a "packing list." 19 C.F.R. § 142.3; *see also* 19 C.F.R. § 141.81 ("A commercial invoice shall be presented for each shipment of merchandise at the time the entry summary is filed. . . ."). The regulations further specify that a commercial invoice must set forth "[t]he purchase price of each item in the currency of the purchase." 19 C.F.R. § 141.86(a)(5); *see also* 19 C.F.R. § 141.83(c) (specifying that "[t]he commercial invoice shall be prepared in the manner customary in the trade [and] contain the information required by §§141.86 through 141.89").

D. **The False Claims Act**

20. The False Claims Act provides, in pertinent part, that any person who:

(C) conspires to commit a violation of subparagraph . . . (G); . . . or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

21. For purposes of the False Claims Act, "the terms 'knowing' and 'knowingly' mean that a person, with respect to information[,] (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the

-6-

information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

22. The False Claims Act defines the term "obligation," in pertinent part, as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation."

23. For purposes of the False Claims Act, the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

## Factual Allegations

**A. The Importation Practices of OBO, Phoenix, and Royal Sourcing Before the United States Began to Impose New Tariffs in 2018**

24. Before the United States started imposing additional tariffs on Chinese merchandise in 2018, Royal Sourcing and OBO followed a regular process to export merchandise to the United States. This process included the following steps:

a. Royal Sourcing would issue a purchase order to a Chinese vendor for a specified quantity of goods at a specified price.

b. The vendor would create a pro forma invoice showing the agreed price.

c. Some vendors would require a signature and stamp from Royal Sourcing on the pro forma invoice.

d. The vendor would proceed with manufacturing the goods ordered.

e. The vendor would arrange transport of the goods to a port in China from which the goods would be shipped to the United States.

f. Before the goods arrived in the United States, Royal Sourcing would request the bill of lading and a final commercial invoice from the vendor. The commercial invoice typically would match the original terms of the pro forma invoice but would contain additional detail

        concerning the shipping and might reflect small changes to the quantities and prices.

    g.    Royal Sourcing's finance manager would forward the final commercial invoice to OBO for payment.

    h.    Through Royal Sourcing, OBO would pay the vendor the amount on the commercial invoice. Depending on the vendor, OBO would pay either before the goods were released to OBO or, if the vendor were willing to extend credit terms, within the agreed time period.

### B. The Fraudulent Importation Practices of OBO, Phoenix, and Royal Sourcing After the United States Began to Impose New Tariffs in 2018

    25.    For any merchandise that OBO (or, beginning in 2019, Phoenix) imported after the new tariffs began to take effect in 2018, Royal Sourcing would attempt to convince its vendors to provide discounts to offset the new tariffs. If a particular vendor was not willing to reduce the price sufficiently to offset the tariff, Royal Sourcing and OBO or Phoenix would follow the process described above through the time of shipment of the goods to the United States (step e, above), but then the process would change, as follows:

    f.    Before the goods arrived in the United States, Royal Sourcing would request the bill of lading from the vendor and, depending on the relationship with the vendor, Royal Sourcing either would request that the vendor issue a new fake commercial invoice at a reduced price, or Royal Sourcing itself would create a new fake commercial invoice at a reduced price. Royal Sourcing referred to this step as "reinvoicing."

    g.    Royal Sourcing's finance manager would forward to OBO or Phoenix a pro forma invoice reflecting the actual cost of the goods, a fake commercial invoice for the goods, and, in many cases, a fake invoice for a testing or certification fee in the amount of the difference between the pro forma invoice and the fake commercial invoice for the goods.

h. Through Royal Sourcing, OBO or Phoenix would pay the vendor the amount on the pro forma invoice. Depending on the vendor, OBO or Phoenix would pay either before the goods were released to OBO or Phoenix, or, if the vendor were willing to extend credit terms, within the agreed time period.

26. The testing or certification fees were bogus because, with very limited exceptions, no such testing or certification occurred.

27. The defendants documented their tariff evasion in a variety of ways, including on a purchase order spreadsheet that they updated regularly. A typical order involved multiple products, each with its own part number. The spreadsheets contained separate lines for each part number that was in an order. Each line showed, among other things, the date of the order, the vendor, the part number of the product ordered, the quantity of the product ordered, the real unit price of the product, the fraudulently adjusted unit price of each product (which was labeled the "Re-invoicing" price), the aggregate real price for the quantity of each item ordered, the total real price of all the products in the order (which was labeled "Total Amount"), the number of days of credit agreed by the vendor, the estimated departure date from China, and the estimated arrival date in the United States.

**Example of Defendants' Conduct, Pre- and Post-Tariff**

28. <u>Pre-Tariff Purchase Order 8885 (including part number 014-HG-14085-WH)</u>. On May 19, 2018, Royal Sourcing issued purchase order 8885 for certain merchandise from a Chinese vendor, Anji Hengchuan Furniture Factory Co., Ltd. The order included 25 bar chairs bearing part number 014-HG-14085-WH at a unit price of $53.96. The order shipped from China on or about July 14, 2018, for delivery through the Port of Los Angeles to a Wayfair warehouse in Perris, California, with OBO as the consignee. On information and belief, the shipment arrived in Los Angeles in late July 2018. The bar chairs fell within HTS code 9401.71.00 ("Other upholstered seats with metal frames"), which was on List 3. *See*

83 Fed. Reg. at 48002, 48191. Since the first additional tariffs on List 3 items did not take effect until September 24, 2018, this shipment was not subject to an additional tariff. On September 16, 2018, the Royal Sourcing finance manager, Yammie Leung, sent two e-mails to Relator and Derek Poon, the CEO of Royal Sourcing and CFO of OBO, concerning purchase order 8885. With one of the e-mails, Ms. Leung attached a commercial invoice from Anji Hengchuan Furniture Factory Co., Ltd. to Royal Sourcing; this invoice again showed the unit price of the bar chairs to be $53.96. With the other e-mail, Ms. Leung attached an invoice from Royal Sourcing to OBO; this invoice showed the unit price of the bar chairs to be $59.36, which was 10 percent higher than the invoice amount from the vendor. Before the additional tariffs began to take effect, Royal Sourcing often added such mark-ups to show that it had independent revenues, in contemplation of going public and obtaining a listing on the Hong Kong Stock Exchange.

29. <u>Post-Tariff Purchase Order 9616 (including part number 014-HG-14085-WH)</u>. On October 11, 2018, Royal Sourcing issued purchase order 9616 for certain merchandise from Anji Hengchuan Furniture Factory. Like purchase order 8885, this order included bar chairs bearing part number 014-HG-14085-WH, this time in a quantity of 40 with a unit price of $51.90. The total price of the merchandise in purchase order 9616 was $19,059.50. The order shipped from China on or about November 11, 2018, for delivery through the Port of New York to a Wayfair warehouse in Cranbury, New Jersey, with OBO as the consignee. The shipment arrived in the United States on or about December 4, 2018. Since the bar chairs (and other items in the shipment) were on List 3, they were subject to the additional 10 percent tariff that had taken effect on September 24, 2018. *See* 83 Fed. Reg. 47974. To offset this tariff, Royal Sourcing fraudulently reduced the unit price of each item in the shipment by 15 percent. Thus, on January 7, 2019, the Royal Sourcing finance manager, Ms. Leung, sent an e-mail to Relator and Mr. Poon, the CEO of Royal Sourcing and CFO of OBO, attaching, among other things, an Excel

file containing a fake commercial invoice for the merchandise in purchase order 9616, a fake commercial invoice for a "testing fee" for the order, and a packing list. The fake commercial invoice for the merchandise in the purchase order showed the unit price of the bar chairs to be $44.12 (as opposed to the $51.90 price on the purchase order), and the total price of the order to be $16,201.80 (as opposed to the $19,059.50 total price on the purchase order). Meanwhile, the fake "testing fee" invoice was in the amount of $2,857.70, which was exactly 15 percent of the real total price of the order and matched the difference between the real total price and the fake total price. In fact, there was no testing done on the products in purchase order 9616, and the amount of the testing fee was a ruse by Royal Sourcing to avoid paying the full duty owed on the goods OBO imported pursuant to purchase order 9616.

**Further Examples of Defendants' Tariff Evasion**

30. <u>Purchase Order 9195</u>. On June 27, 2018, Royal Sourcing issued purchase order 9195 for 600 barn doors from a Chinese vendor, Hangzhou Metek Co., Ltd. The order shipped from China on or about October 22, 2018, and arrived in Los Angeles on or about November 5, 2018, with OBO as the consignee and 60-day payment terms. The barn doors fell within HTS code 4418.20.80 ("Doors of wood, other than French doors"), which was on List 3. *See* 83 Fed. Reg. at 48094. Consequently, the shipment was subject to the additional 10 percent tariff that took effect on September 24, 2018. *See* 83 Fed. Reg. 47974. Because the doors were subject to the new tariff, Royal Sourcing was able to negotiate a five percent discount from the vendor. Still, Royal Sourcing fabricated documents to make it appear that the price was even lower. On December 18, 2018, the Royal Sourcing finance manager, Ms. Leung, sent an e-mail to Relator and Mr. Poon, the CEO of Royal Sourcing and CFO of OBO. The attachments to the e-mail included an Excel file with five tabs: "original PI," "PI," "80% CI," "CI FOR EXTRA COST," and "PACKING LIST." The "original PI" tab showed a pro forma invoice with a total

-11-

price of $47,880.00. The "PI" tab showed a revised pro forma invoice with a total price of $45,480.00, reflecting the five percent discount Royal Sourcing had negotiated with the vendor. The "80% CI" tab showed a fake commercial invoice with a total price of $38,304, approximately 15.8 percent below the revised pro forma price Royal Sourcing had negotiated. The "CI FOR EXTRA COST" tab showed a fake commercial invoice for a "Testing & Certification fee" of $7,176.00," which was the difference between the revised pro forma price and the fake commercial invoice price. In fact, there was no testing or certification done on the barn doors in purchase order 9195, and the amount of the testing and certification fee was a ruse by Royal Sourcing to avoid paying the additional duty owed on the goods OBO imported pursuant to that purchase order.

  31. <u>Purchase Order 9510</u>. On September 20, 2018, Royal Sourcing issued purchase order 9510 for specific quantities of 30-gallon and 32-gallon gas caddies from a Chinese vendor, Yongkang Jinding Mechanical Tools Co., Ltd. ("YJM"). The real "Total Amount" of the order was $29,426.48, with 60-day credit terms. The order shipped from China on or about October 16, 2018, and arrived in Los Angeles on or about October 29, 2018, with OBO as the consignee. The gas caddies fell within HTS code 7310.10.00 ("Iron/steel, tanks, casks, drums, cans, boxes & simi. cont. for any material (o/than compress./liq.gas), w/cap. of 50+ l but n/o 300 l"), which was on List 3. *See* 83 Fed. Reg. at 48155, 48188. Consequently, the shipment was subject to the additional 10 percent tariff that took effect on September 24, 2018. To offset this tariff, Royal Sourcing fraudulently reduced the unit price of each item in the shipment by 20 percent. First, however, the Royal Sourcing finance manager, Ms. Leung, sent an e-mail dated October 18, 2018, to Relator and Mr. Poon, the CEO of Royal Sourcing and CFO of OBO. In this e-mail, Ms. Leung asked Relator to "Please check if YJM is under tariff," and she attached an Excel file with a real commercial invoice from YJM and a packing list for the shipment. The real commercial invoice showed the total price of the merchandise in purchase

order 9510 to be $29,426.48. On December 11, 2018, after Relator confirmed that the YJM gas caddies were subject to the new 10 percent tariff, Ms. Leung sent Relator and Mr. Poon a second e-mail with an Excel file containing a new set of invoices for purchase order 9510. This Excel file included an "original PI" tab with a "PROFORMA INVOICE/SALES CONFIRMATION" showing the real price of $29,426.48 (but with the mistaken date of "SEP.19,2019"), a "PI" tab with another "PROFORMA INVOICE" showing the same price (and dated October 19, 2018), an "80% CI" tab with a fake "COMMERCIAL INVOICE" showing a reduced total price of $23,541.18, and a "CI FOR EXTRA COST" tab with a second fake "COMMERICAL INVOICE" for a supposed "Certification Fee" of $5,885.30, which was the difference between the real total price and the fake total price of the gas caddies. In fact, there was no certification done on the gas caddies in purchase order 9510, and the amount of the certification fee was a ruse by Royal Sourcing to avoid paying the additional duty owed on the goods OBO imported pursuant to that purchase order.

32. <u>Purchase Order 9539</u>. On September 25, 2018, Royal Sourcing issued purchase order 9539 for specific quantities of 13 models of office chairs from a Chinese vendor, Anji Hengchuan Furniture Factory. The "Total Amount" of the order was $14,612.60 with 60-day credit terms. The order shipped from China on or about November 29, 2018. The consignee was OBO, but the order was delivered through the Port of New York to Wayfair in Cranbury, New Jersey, on or about December 26, 2018. The office chairs fell within HTS code 9401.30.80 ("Seats . . . swivel w/ variable height adjustment & other than w/ wooden frame"), which was on List 3. Consequently, the shipment was subject to the additional 10 percent tariff that took effect on September 24, 2018. To offset this tariff, Royal Sourcing fraudulently reduced the unit price of each item in the shipment by 15 percent. Thus, on January 28, 2019, the Royal Sourcing finance manager, Ms. Leung, sent an e-mail to Relator and Mr. Poon, the CEO of Royal Sourcing and CFO of OBO,

attaching, among other items, an Excel file with a pro forma invoice for the office chairs, a purported commercial invoice for the office chairs, and a purported commercial invoice for a "[t]esting fee," as well as the bill of lading for the shipment. The pro forma invoice stated, accurately, that the total price for the office chairs was $14,612.60. By contrast, the purported commercial invoice falsely stated that the total price for the office chairs was $12,422.36 (i.e., the "re-invoicing" price that OBO used to fraudulently reduce its duty obligation for the recliners under the new tariffs). Meanwhile, the testing fee invoice was in the amount of $2,190.24, which was the difference between the total actual price of the order and the total fake price of the order. In fact, there was no testing done on the products in purchase order 9539, and the amount of the testing fee was a ruse by Royal Souring to avoid paying the duty owed on the goods OBO imported pursuant to that purchase order.

33. <u>Purchase Order 10595</u>. On April 30, 2019, Royal Sourcing issued purchase order 10595 for specific quantities of 15 models of wooden barn doors from a Chinese vendor, Hangzhou Meant Building Material Co., Ltd. – Metek ("Metek"). On May 9, 2019, a Metek employee sent an e-mail to Relator and several other employees of Royal Sourcing and OBO. The e-mail attached a pro forma invoice showing the unit prices of each item in the order and a total order price of $50,473.00. The order shipped from China on or about August 29, 2019, and arrived in Los Angeles, California, on or about September 9, 2019, with Phoenix as the consignee. The doors fell within HTS code 4418.20.80 ("Doors of wood, other than French doors"), which was on List 3. <i>See</i> 83 Fed. Reg. at 48094. Consequently, the shipment was subject to the additional 25 percent tariff that took effect on May 10, 2019. <i>See</i> 84 Fed. Reg. 20459. To offset this tariff, Royal Sourcing fraudulently reduced the unit price of each item in the shipment by an amount that ranged between 28 and 69 percent. Thus, on November 18, 2019, the Royal Sourcing finance manager, Ms. Leung, sent an e-mail to Relator and Mr. Poon, the CEO of Royal Sourcing and CFO of OBO, attaching an Excel file with tabs for a purported

invoice from Royal Sourcing to Phoenix for the doors with a fake price $21,437.72, and a purported invoice from Royal Sourcing to Phoenix for a fake testing fee of $29,686.20, for a total of $51,123.92. Meanwhile, on November 5, 2019, the Metek employee had sent Relator and other Royal Sourcing employees an e-mail asking for payment of $51,123.92 on purchase order 10595. The e-mail from the Metek employee made no mention of testing. In fact, there was no testing done on the products in purchase order 10595, and the amount of the testing fee was a ruse by Royal Sourcing to avoid paying the duty owed on the goods Phoenix imported pursuant to that purchase order.

34. *Purchase Order 11650*. On February 26, 2020, Royal Sourcing issued purchase order 11650 for specific quantities of four models of leather recliners from a Chinese vendor, Anji Chuanhai Import and Export Trade Co., Ltd. The "Total Amount" of the order was $15,036, with 60-day credit terms. The order shipped from China on or about March 22, 2020. The consignee was OBO, but the order was delivered through the Port of New York to Wayfair in Cranbury, New Jersey, on or about April 17, 2020. The recliners fell within HTS code 9401.61.40 ("Other upholstered seats with wooden frames"), which was on List 3. *See* 83 Fed. Reg. at 48002, 48191. Consequently, the shipment was subject to the additional 25 percent tariff that took effect on May 10, 2019. *See* 84 Fed. Reg. 20459. To offset this tariff, Royal Sourcing fraudulently reduced the unit price of each item in the shipment by 28 or 29 percent. Thus, on May 6, 2020, the Royal Sourcing finance manager, Ms. Leung, sent an e-mail to Relator and Mr. Poon, the CEO of Royal Sourcing and CFO of OBO, attaching, among other things, a purported invoice from Royal Sourcing to OBO for the recliners. The invoice stated that the total price for the recliners was $10,753.60. In Ms. Leung's cover e-mail, however, she wrote that the price was $15,036. The lower invoice price of $10,753.60 was merely the "re-invoicing" price that OBO used to fraudulently reduce its duty obligation for the recliners under the new tariffs.

35. <u>Purchase Order 11574</u>. On March 12, 2020, Royal Sourcing issued purchase order 11574 for specific quantities of barrel chairs from a Chinese vendor, Anji Chuanhai Import and Export Trade Co., Ltd. The real "Total Amount" of the order was $10,336.50, with 60-day credit terms. The order shipped from China on or about April 10, 2020, for delivery through the Port of New York to a Wayfair warehouse in Cranbury, New Jersey, with OBO as the consignee. The shipment arrived in the United States on or about May 10, 2020. The barrel chairs fell within HTS code 9401.61.40 ("Other upholstered seats with wooden frames"), which was on List 3. *See* 83 Fed. Reg. at 48002, 48191. Since the barrel chairs were on List 3, they were subject to the additional 25 percent tariff that had taken effect on May 10, 2019. *See* 84 Fed. Reg. 20459. To offset this tariff, Royal Sourcing fraudulently reduced the unit price of each item in the shipment by between 62 and 65 percent. Thus, on May 28, 2020, the Royal Sourcing finance manager, Ms. Leung, sent an e-mail to Relator and Mr. Poon, the CEO of Royal Sourcing and CFO of OBO, attaching, among other things, an Excel file with tabs for a pro forma invoice showing the chairs' real total price of $10,336.50, a fake commercial invoice showing a reduced total price for the chairs of $3,740.00, and a fake commercial invoice for a "Testing fee" of $6,596.50, which was the difference between the total actual price of the order and the total fake price of the order. In fact, there was no testing done on the products in purchase order 11574, and the amount of the testing fee was a ruse by Royal Sourcing to avoid paying the duty owed on the goods Phoenix imported pursuant to that purchase order.

36. <u>Purchase Order 14248</u>. In late 2020, toward the end of Relator's time of employment at Royal Sourcing, he often received only summary information indicating that defendants were evading tariffs. For example, on November 12, 2020, the Royal Sourcing finance manager, Ms. Leung, sent an e-mail to Relator and Mr. Poon, the CEO of Royal Sourcing and CFO of OBO, without any attachments but with a listing of information concerning multiple purchase orders,

-16-

including purchase order 14248. For purchase order 14248, Ms. Leung's e-mail showed two invoices, invoice "HK-BEACON-20-1028" in the amount of $4,533.90, and invoice "HK-BEACON-20-1028 FEE" in the amount of $5,992.10. The total of these two invoice amounts, $10,526.00, matches the real total price of the order. Thus, in late 2020, Royal Sourcing and the defendants were continuing to shift much of the price of the merchandise they imported from the real invoice prices to bogus fees on which they did not pay duty.

### Count I: Reverse False Claims
### (31 U.S.C. § 3729(a)(1)(G))

37. Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

38. Defendants knowingly made, used, or caused to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money, in the form of customs duties, to the United States. Specifically, defendants knowingly made or used fake invoices that fraudulently underrepresented the prices of merchandise they imported into the United States from China, and defendants accordingly underpaid customs duties on that merchandise.

39. By virtue of the false or fraudulent records and/or statements defendants made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each instance in which they made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the United States.

### Count II: Conspiracy
### (31 U.S.C. § 3729(a)(1)(G))

40. Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

41. Defendants knowingly conspired with Royal Sourcing and their Chinese vendors to make, use, or cause to be made or used false records and/or

-17-

statements to conceal, avoid, or decrease obligations to pay or transmit money to the United States. Specifically, defendants knowingly conspired with Royal Sourcing and their Chinese vendors to make or use fake invoices that fraudulently underrepresented the prices of merchandise defendants imported into the United States from China, and defendants accordingly underpaid customs duties on that merchandise.

42. By virtue of the false or fraudulent records and/or statements defendants conspired with Royal Sourcing and their Chinese vendors to make or use, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each instance in which defendants conspired to make or use a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the United States.

### Prayer for Relief

WHEREFORE, Relator demands and prays for the following relief:

1. On Counts I and II, that judgment be entered in favor of the United States and against the defendants, jointly and severally, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

2. An award to the Relator of a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730(d);

3. An award to the Relator of his costs and reasonable attorneys' fees for prosecuting this action; and

4. All other relief as may be required or authorized by law and in the interests of justice.

### Demand for Jury Trial

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Dated: June 10, 2021

Respectfully submitted,

Relator Chi Kwan Chan

By: _____
Gregg Shapiro
Newman & Shapiro
Attorney for Relator